65 So.2d 34 (1953)
CITY OF MIAMI
v.
BETHEL et al.
Supreme Court of Florida, en Banc.
April 28, 1953.
Rehearing Denied May 25, 1953.
S.O. Carson, J.W. Watson, Jr., John H. Wahl, Jr., and Walton Hubbard, Schroeder, Lantaff & Atkins, Miami, for appellant.
Morehead, Forrest, Brown & Gotthardt and Lawrence G. Ropes, Jr., Miami, for appellees.
SEBRING, Justice.
The City of Miami has appealed from an adverse judgment rendered in an action at law instituted by the appellee, Kelsey Bethel, to recover damages for injuries resulting to him from an alleged beating by two police officers of the municipality.
From certain evidence in the record which the jury had a right to believe, it appears that shortly prior to the alleged beating, the plaintiff, Bethel, was shooting craps with a group of friends in the back yard of a certain property on which was located a building containing a poolroom. After losing all his money, Bethel quit the crap game and walked into the poolroom. Shortly thereafter two policemen of the City of Miami appeared on the scene and the crap shooters scattered. Some of the participants ran into the poolroom pursued by the policemen. As one of the police officers came into the building he saw the plaintiff and accused him of having been a participant in the crap game. When Bethel denied having been in the game, the officer laid hands on him, took him outside the building, and held him while the other officer gave him a severe beating.
The question on the appeal is whether the city is liable for the beating administered to the plaintiff by the police officers of the city.
Whatever the law may be elsewhere, it has long been established in this jurisdiction that a municipal corporation is not liable for the tortious acts of its police officers committed as incident to the exercise of a purely governmental function. As the principle is stated in Kennedy v. City of Daytona Beach, 132 Fla. 675, 182 So. 228, 229:
"When, by the action of the state, a municipal corporation is charged with the preservation of the peace, and empowered to appoint police boards and other agencies to that end, the corporation pro tanto is charged with governmental functions in the public interest and for public purposes and in the exercise of its powers and duties in respect of the enactment and enforcement of police regulations it is entitled *35 to the same immunity as the sovereign granting the power unless such liability is expressly declared by the sovereign. The police regulations of a city are not made and enforced in the interest of the city in its corporate capacity, but in the interest of the public. A city is not liable therefore for the acts of its officers in attempting to enforce such regulations * * *. Furthermore, police officers can in no sense be regarded as servants or agents of the city. Their duties are of a public nature. Their appointment is devolved upon cities and towns by the legislature as a convenient mode of exercising a function of government; but this does not render the cities and towns liable for their assaults, trespasses or negligent acts, while acting in the performance of such public duties, unless liability is imposed by statute, or unless the municipal charter or some special statute makes members of the police force agents of the municipality. [43 C.J. 964]."
The doctrine of municipal immunity for tortious acts committed by employees engaged in governmental functions is derived from the common law which was adopted by the Legislature. McCain v. Andrews, 139 Fla. 391, 190 So. 616; Swanson v. City of Fort Lauderdale, 155 Fla. 720, 21 So.2d 217; Bradley v. City of Jacksonville, 156 Fla. 493, 23 So.2d 626. Also see 38 Am.Jur. 265, 272, 317. Hence, if the doctrine is to be altered, the responsibility for such change must rest with the legislative, not with the judicial, branch of the government.
While it may be that the police officers in the instant case can be made to respond civilly or criminally for the acts committed by them  a question not before us  it is clear from the decisions that in those instances where a municipality has been held liable for the unlawful commission by its agents of an act otherwise lawful, recovery has been confined to those cases where the act attempted and the unlawful manner of its execution have been clearly outside the area of governmental functions.
From the conclusions reached it follows that the judgment appealed from should be reversed.
It is so ordered.
THOMAS, MATHEWS and DREW, JJ., concur.
HOBSON, J., concurs specially in judgment of reversal.
ROBERTS, C.J., and TERRELL, J., dissent.
HOBSON, Justice (concurring specially in judgment of reversal).
I am impelled to state that although I did not find in my research a single case from this or any other jurisdiction in which the Court has departed from the general rule that a municipality while acting in a governmental, as distinguished from a proprietary, capacity is not liable in tort for negligence of its officers, agents or employees, yet the reasons uniformly given for such rule are not, in my judgment, in this era of modernity, logical or sound.
It has been suggested that the propriety of receding from the doctrine of nonliability of a city in performance of governmental functions should be determined by the legislature rather than by the courts. This contention is bottomed upon the fact that Florida adopted the common and statute law of England which was in force on July 4, 1776. An examination of the common law discloses that this doctrine originated with the courts. It was not on July 4, 1776, and, as far as the writer has been able to ascertain, has never become, a part of the statute law of England. Moreover, the first case which it is largely assumed dealt with the subject is Russell v. The Men of Devon, 2 T.R. 667. It was not decided until the year 1788 and was not a case dealing with liability of a municipality for torts committed by its officers, agents or servants but was an attempt to maintain an action and secure a judgment against the inhabitants of a county. Actually the question involved was the propriety of the court sustaining an action against the residents of said district bottomed upon the failure of such individuals to maintain a *36 public bridge in a reasonably safe condition. Under the common law a county was considered part and parcel of the sovereign and sovereign immunity to such an action would have been invoked; hence, the attempt to maintain a suit against the inhabitants of a county.
Thus it may be seen that at the time this State adopted the common and statute law of England no authority existed, nor did such authority actually exist by virtue of the decision in Russell v. The Men of Devon, (1788), supra, for the ruling that a municipality should not be held liable in a tort action if the cause of action arose by virtue of performance of a governmental function. It is true that this Court has subscribed to the doctrine of nonliability of municipalities in performance of governmental functions but we have as much right to recede from such ruling, if we deem it appropriate to do so, as we have to depart from any other pronouncement of law which we have made. I am as firm an advocate of the doctrine of stare decisis as any judicial officer should be. However, when the reasons for prior decisions are unsound, obsolete and tend to defeat rather than administer justice, I would not hesitate to depart from established court-made law.
Many reasons have been advanced in support of the doctrine of municipal nonliability in cases wherein the officers, agents or servants of the city were performing governmental functions. Among the reasons which apparently gave birth to this doctrine are:
(1) fear that the property of the city might be sold to satisfy the judgment with the result that the objects for which the city was created would be thwarted;
(2) the possibility that property belonging to individual residents of the city might be subjected to execution consequent upon a judgment;
(3) the sovereign is immune from suit unless such immunity is waived;
(4) and some states, including Florida, have held that the officer or employee of the city, if his act be one consequent upon performance of a governmental function, is not actually the servant of the city but of its citizens as a whole and the rule of respondeat superior cannot be applied.
The first of the foregoing reasons is obviously unsound because the question of how or if a judgment may be satisfied has no place in the determination of the question whether an action will lie. The enforcement of a judgment if obtained might be permitted only against property owned by the city which is not essential to the operation of the city in connection with the objects for which it was established.
The thought that property of the individual residents of the city might be subjected to levy and sale is not tenable because liability of property owners residing in a city for the debts of the municipality has never been the generally accepted rule in this country  certainly not in this jurisdiction.
The answer to the suggestion of sovereign immunity from suit lies in the recognized fact that in this State although a municipality receives its charter from the State, it is not, like a county, a subdivision or integral part of the State government but is in fact an independent governmental unit and functions as such, subject, of course, to the limitations of its charter.
The theory that a city employee when performing duties which are governmental in character is acting for the public generally and not for the city although it employed him and assigns him to and directs his work, if carried to its logical conclusion, would likewise exempt the employee from personal liability. If he be decreed to be the servant of the public then he is acting for and in the place and stead of all the people and should not be answerable for his tortious conduct any more than the city should be unless he is guilty of "stepping aside" and committing a tort which could not be catalogued as being within the scope of his authority, express or implied, or in other words an act which could not have been anticipated or foreseen by the employer (the city or the public which he and it represent). The end result would offend one of the fundamental principles of our concept of government as set forth in Section 4 of our Declaration of Rights, F.S.A.:

*37 "All courts in this State shall be open, so that every person for any injury done him in his lands, goods, person or reputation shall have remedy, by due course of law, and right and justice shall be administered without sale, denial or delay."
Absent a federal question the supreme law of this State is found in our Constitution and Declaration of Rights.
Of course the legal assumption that a city employee while performing a duty governmental in character is a public and not a city servant was indulged for the purpose of convenience in the dubious although good faith attempt at furtherance of justice. Nevertheless, it is nothing more nor less than an adaptation of the fallacious philosophical conjecture epitomized by the expression "sovereign immunity."
It might be contended (although in every opinion of this Court which I have found and considered the pronouncement should be classified as obiter dictum) that this Court has subscribed to the doubtful hypothesis that the agent of the city who commits the wrong is not truly the servant of the city but of the public if he be performing a governmental function and that the rule of respondeat superior is not applicable. However, if this be true, the fiction thus created and proclaimed lends no strength to the doctrine of municipal nonliability for tortious acts committed in the performance of governmental functions. The enigma  when is a function governmental and when proprietary  still exists.
In the early days of municipal corporations when the subject rule of municipal nonliability evolved it was not so difficult as it is today to draw an accurate line between the two spheres of operation  governmental and proprietary. City activities were confined almost exclusively to the field which embraces the essential requirements of government, but since the turn of the century municipalities have rapidly entered the erstwhile domain of private enterprise. As was stated by Professor Murrary Seasongood of the University of Cincinnati Law School, in his article Municipal Corporations: Objections To The Governmental Or Proprietary Test, contained in Vol. XXII Va. Law Review, "But now as various functions fuse the classes overlap, and the commingling will increase as urban civilization becomes more complex and inclusive."
The principle of municipal nonliability while acting in a purely governmental capacity which was established in the long, long ago has become archaic and is now outmoded. I am constrained to agree with the philosophy expressed by Mr. Justice Terrell in the case of State ex rel. Watkins v. Fernandez, 106 Fla. 779, 143 So. 638, 641, 86 A.L.R. 240:
"In a changing world marked by the ebb and flow of social and economic shifts, new conditions constantly arise which make it necessary, that no right be without a remedy, to extend the old and tried remedies. It is the function of courts to do this. It may be done by working old fields, but, when it becomes necessary, they should not hesitate to `break new ground' to do so."
In this modern era cities may well be classified in the category of "big business". Their coffers are not filled even primarily by the levy and collection of ad valorem taxes. Excise taxes and revenues from "business" activities such as those derived from furnishing utilities like water, gas and electricity provide the major portion of the operating funds of the cities of this day and age. Regardless of whether a city is acting in a governmental or proprietary capacity, if a citizen is injured as the result of the tortious conduct of a city employee while acting within the scope of his apparent authority as such servant these monies of the city and its property which is not essential to carrying out the objects for which the city was formed should in all fairness be subject to invasion for the purpose of recompensing the individual who has been wronged. To hold that a modern city is not liable under the doctrine of respondeat superior for the tortious conduct of its employee while acting within the scope of his apparent authority is but to ignore reality and approve injustice. Such ruling of necessity must evolve from indulgence in a form of autism which should never constitute a predicate for judicial pronouncement. *38 If the employee is working for the city and under its direction, I can see no valid or sound reason why the city, as any other employer, should not be liable for his wrongful act committed in the course of his employment which results in injury to another. The city should be held responsible either as a special or general employer. As aforementioned, city owned property essential to the carrying out of the objects for which the city was created might be held exempt from levy and sale upon judgment secured as a result of a tort action of the type under consideration.
In this case it is my opinion that the action should be held to be maintainable; that the doctrine of respondeat superior should be invoked and that a jury should determine whether the police officers were acting within the scope of their apparent authority express or implied or whether their conduct was a "stepping aside" or something which might not have been anticipated or foreseen by the employer (the city). It has been suggested that such ruling would result in a catastrophic deluge of litigation. It is my thought that there would be no appreciable increase in litigation because the electorate would become more cautious in selecting city officials and the city fathers, in turn, would choose municipal employees with appropriate regard for their competency and would discard, at least to some degree, the age-old habit of dispensing jobs to repay political obligations with little or no consideration being given to fitness or qualifications. Moreover, there would be a tendency to train city employees more thoroughly in connection with the performance of their duties. The employer in private enterprise to whom the doctrine of respondeat superior applies gives careful attention to these matters and I apprehend he does so largely because he is held liable for tortious acts of his employees committed while acting within the scope of their apparent authority.
I would reverse the final judgment from which this appeal is prosecuted and order a new trial with express direction to the Circuit Court to allow a repleader if requested so to do. I would agree to an affirmance of the judgment, were it not for the fact that the city probably in reliance upon our prior decisions, did not deem it necessary to file a plea to the effect that the police officers were guilty of "stepping aside" and committing a tortious act which could not reasonably have been anticipated or foreseen by the employer (the city). Had a majority of the Court receded from our prior pronouncements then, in all fairness, the city would be entitled to an opportunity to replead.
TERRELL, Justice (dissenting).
Appellee was arrested by a Miami policeman on suspicion that he had been playing craps, contrary to the city ordinance. Denying the charge, the arresting policeman, aided by a second one, proceeded to put him through the "third degree" presumably to extract a confession. The end result was a severe beating with a policeman's billy, bruises and lacerations of the body and one eye knocked out. A suit for damages resulted in a verdict and judgment for appellees. The majority opinion reverses on the theory that a municipal corporation is not liable for the tortious acts of its policemen committed in the exercise of purely governmental functions, no liability therefore being imposed by statute.
I recognize the rule of nonliability of a municipal corporation for the tortious acts of its agents committed in the exercise of strictly governmental functions, but I deny that the rule has any application where a city policeman takes one in custody, initiates him in the "third degree" in the hope of forcing a confession, and in doing so knocks out one eye with a billy, rendering him blind. If that be the performance of a strictly governmental function, my fifty years of law study have taught me nothing about the law of torts as applied to municipalities. The trend of decisions everywhere is that immunity from liability for tort is limited to municipal corporations and other government agencies that perform some phase of state sovereignty and who are without funds to respond in damages. Keggin v. County of Hillsborough, 71 Fla. 356, 71 So. 372, and similar cases.
*39 From their very inception the courts in this country have pruned and restricted the doctrine of governmental immunity for tort. Ballard v. City of Tampa, 124 Fla. 457, 168 So. 654; Lewis v. City of Miami, 127 Fla. 426, 173 So. 150; City of West Palm Beach v. Grimmett, 102 Fla. 680, 136 So. 320, 137 So. 385; Swindal v. City of Jacksonville, 119 Fla. 338, 161 So. 383; Kaufman v. City of Tallahassee, 84 Fla. 634, 94 So. 697, 30 A.L.R. 471; and same title 87 Fla. 119, 100 So. 150; and many others might be cited. If there ever was a case in which the doctrine should be pruned, certainly this is one. If a policeman as agent of the city can take one into custody and beat his eye out with a billy furnished him by his employer, in the hopes of extracting a confession, and then claim immunity because he is performing a governmental function, then there is no limit to the devices he may resort to to terrorize one suspected of crime.
There is no basis in law or reason to contend that there must be legislative fiat to supplant the common law in order that a municipality be held to respond in damages for the torts of its agents. In every state or country inured to the common law tradition, the courts have been diligent in promulgating the law which governs the day by day transactions of life. In such countries progress and improvement in the law are more often defined by well reasoned judgments than they are by legislative acts. It is generally conceded that judicial interpretation is a superior method of developing rules of daily conduct because it proceeds from well reasoned decisions of experts in the field of law making. It is law making at its best. The great body of English and American Common Law was built up by judicial decisions. It is being added to every day by Judge made law. While it does not enter the field of policy making, after this is done, court interpretation guides progress and improvement in the affairs of men. This case presents a typical example in which the courts have responded to the urge to pronounce the governing law. The judge's chambers is the medium through which the body of our law has been purified and enriched.
In Chamberlain v. Chamberlain, 115 Fla. 21, 155 So. 136, we held the distinguishing characteristic of the common law to be that it expands or contracts to comprehend the changing conditions of the social and economic order. The courts perform some phase of the functions every time they are confronted with a statute, rule, regulation or mores that requires interpretation, clarification or application to the end that justice and good order may be effected. In a country like ours new situations and complexes constantly arise that require the ingenuity of a skillful court to apply the law to. Rules of law, unlike rules of mathematics frequently require change and modification. It is the very essence of the common law. I do not intend to "dodge" or abandon my responsibility in this. Judge made law does not comprehend policy making but in the field of interpretation, clarification and application, it is preeminent.
In so holding I do not overlook those cases which hold that a city cannot be held liable for ultra vires acts or for torts committed pursuant to an unlawful or negligent act, such as was involved in Brown v. City of Eustis, 92 Fla. 931, 110 So. 873, and that line of cases. We are confronted with no such case here. We are confronted with a case in which the policeman lawfully took one in custody, but every act ensuing the arrest was performed in an unlawful, unauthorized manner. By no stretch of the imagination was he performing a sovereign function. The very purpose of the Fifth Amendment to the Federal Constitution was to put an end to confessions produced by "third degree" methods or other forms of torture. It was flagrantly violated in this case.
I think that law, justice, and reason require an affirmance of the judgment appealed from. I therefore dissent from the majority opinion. Legions of cases support this conclusion.
ROBERTS, C.J., concurs.