HELEN M. RANDOLPH, Appellant and Cross-Appellee, v. MYRON D. RANDOLPH, Appellee and Cross-Appellant.

1 So. (2nd) 480
Division B
Opinion Filed March 25, 1941
Rehearing Denied April 25, 1941

*Abraham J. Kaplan,* and *William J. Pruitt,* for Appellant; *David B. Newsom,* for Appellee.

TERRELL, J.—The appellee filed his bill for divorce predicated on extreme cruelty and frequent indulgence in a violent and ungovernable temper. He prayed for the custody of two minor children, aged five and two. Appellee answered the bill of complaint where she denied all its material allegations and charged appellee with cruelty and habitual indulgence in a violent and ungovernable temper. She prayed for the custody of the two minor children, alimony, suit money, and attorneys' fees.

On final hearing, the chancellor found that both parties proved their case and entered a decree divorcing each from the other. Like Solomon when called on to adjudicate the claim of the two harlots to the child (I Kings:3), he divided the children equally awarding the older to the father and the younger to the mother, with liberal provision for visitation both ways. He also awarded appellant attorneys' fees and ten dollars per week for support of the younger child, but no award of alimony was made. We are confronted with an appeal and a cross appeal to review this judgment.

Sixteen questions are posed but they are directed primarily to that part of the final decree affecting the custody of the two minor children and neglect or refusal to award alimony. Both parties contend that they should have been given the custody of both children and appellant contends that she should have been awarded alimony and a larger sum for support of the children.

The question of alimony in a case like this is controlled by Section 4987, Compiled General Laws of 1927, as follows:

"Alimony upon decree for divorce: In every decree of divorce in a suit by the wife, the Court shall make such orders touching the maintenance, alimony and suit money to the wife, or any allowance to be made to her, and if any, the security to be given for same, as from the circumstances of the parties and nature of the case may be fit, equitable and just; but no alimony shall be granted to an adulterous wife."

The chancellor made no allowance for alimony but did award appellant ten dollars per week as support for the younger child. Appellee contends that a proper interpretation of the statute so quoted bars any offending spouse from alimony if she was the actuating cause of the divorce, and that since he was granted a divorce for defendant's cruelty, she is not entitled to alimony. He relies on Phinney v. Phinney, 77 Fla. 850, 80 So. 357, to support this contention.

We do not so interpret the statute and the last cited case when read in the light of the statute does not warrant that interpretation. The only class barred absolutely from alimony is the adulterous wife. In all other cases, the chancellor may award such amounts for alimony as the "circumstances of the parties and the nature of the case may be fit, equitable and just." Aside from adultery, the circumstances and conduct of an offending spouse might be such as to bar her from alimony but this is a matter solely in the discretion of the chancellor governed by equity and justice and the condition of both parties. All these factors the chancellor should consider and adjudicate the claim for alimony accordingly.

In the matter of guardianship and custody of the two children, it appears that both parties attempted to smut each

other's character and show unfitness on this point, but the chancellor found that the father and mother were both fit subjects to rear them and awarded the older child to the father and the younger to the mother. The mother contends that since she was found to be a fit guardian for one child, she should have been given the custody of both. The father counters with a like contention and with the further contention that the father has a paramount right to the custody of minor children. He relies on Hopkins v. Hopkins, 84 Fla. 500, 94 So. 157, to support this contention.

It is quite true that under the ancient common law, the father was said to have a superior right of guardianship over minor children but the refinements of Christian ethics early revealed the fallacy of this theory and commenced to modify it as the best interest of the child required. In right and justice, there was never any merit to the doctrine. It was the relic of an era in which woman was regarded as little more than a bedfellow or a sex chattel and was implemented into the law on the sole ground that the father furnished food and raiment. We do not for one moment discount the importance of food; it is the very foundation of all personal values, but it takes much more than food to prepare one for citizenship in a democracy like ours. We may be well fed, yet totally devoid of social responsibility, a passion for justice, and completely unaware of the injustices and inequalities that exist under our very noses so long as they do not affect us personally.

The law of this State (Section 5884, Compiled General Laws of 1927) makes the father and mother joint guardians of the minor children. This is in harmony with the story of creation as recorded in the first chapter of Genesis where we are told that male and female were created equal and commanded to inhabit and subdue the earth. The law of this State (Section 4993, Compiled General Laws of

1927) also provides that in any suit for divorce, the court may make such orders touching the care, custody, and support of the minor children as their "spiritual as well as other interests may require."

So the ultimate test of guardianship in this State is the spiritual and moral well being of the child. With these factors in mind, the chancellor may award it to the father, the mother, or a stranger to the blood as the circumstances require or he may do as he did in this case, make an award to both parents. The idea that the father has a right superior to the mother is a dogma long since obsolete and as dead as the law of primogeniture. It departed the way of many other old common law rules that served the purpose at one time but fail completely to respond to present concepts of justice.

When the reason for any rule of law ceased, the rule should be discarded. If there was ever a reason among civilized people why the father should have right over the mother to the guardianship of a minor child, I am unable to define it. She toyed with her own life to bring it into existence and if not totally bereft of the attributes of motherhood, she is morally, spiritually, and biologically best suited to care for it during infancy and adolescence. She is more sensitive to influences that are derogatory to its health and character and has been known to pursue it to the gutter and retrieve it after the father had abandoned it. In deeds springing from innate nobleness, the mother is the peer of the father and when it comes to instructive and intuitional powers, she is much his superior.

Except in feats involving sheer physical skill, the mother has exemplified potential qualities for guardianship equal to and often superior to the father. She wins scholastic preference as readily, her intellectual quotient is the equal of his and she has made for herself an enviable position in

business and professional life. The name of Washington, Lincoln, and Lee is but the lengthening shadow of three great mothers and they are all so admitted. Victoria will be remembered as long as any king of England, and Katherine the Great as long as any Czar of Russia. Cornelia, better known as the mother of the Gracchi, will live as long as Roman history, and the military exploits of Joan of Arc will be read as long as those of Napoleon. As a philosopher, Hypatia was little less renowned than Plato. What man triumphed over greater handicaps than Helen Keller, or has a bigger audience than Eleanor Roosevelt, Dorothy Thompson and Marion Anderson?

The extent to which man has been the victim of woman's wit and diplomacy is ample to offset his bragging. Eve cast a spell over Adam and he took the forbidden apple. Barak would never have been heard of but for the urge of Deborah, and Jael, the wife of Heber the Kenite, slew Sisera by driving a tent peg through his temples. Samson fell for the duplicity of Delilah and tradition tells us that Cleopatra made a fool of Caesar and Mary Antony. Peggy O'Neal was the bane of Jackson's kitchen cabinet.

So if history be our mentor, there is no field depending on spiritual understanding, moral response, intellectual keenness, or the power to coördinate hand, heart, and brain that the father has shown any right of guardianship over the mother. He can carry a heavier load, so can an ox; he can kick a football farther, but that is no test of qualification for guardianship. He may be called to the colors but he will risk the probability of going to war or to hell either rather than undertake the period of gestation. In civilized society, no calling rises above that of motherhood and in the care of minor children, she makes her most abiding impression. In this, the father is by nature a poor second.

When Lord Coke was experiencing the birth pains of

common law, it may be that his curtilage was a patriarchy as absolute as a feudal estate of the middle ages but not so with the man of the present era. If ever he had the will to wield the rod of authority over his home, the refinements of civilization have drawn his fangs. He is now the world's champion heeler, his wife precedes him through the door and down the aisle; she is waited on before he is and is everywhere preferred to him. He is second at every social function and when he enters his curtilage, the very atmosphere reminds him that he is within the confines of an absolute matriarchy. If it is a benevolent one, he likes it; otherwise he spends his evenings at the club.

We find no reason to reverse the decree appealed from. The chancellor reserved jurisdiction so he can deal with the question of alimony and custody in the future if circumstances require. He was confronted with a difficult situation, too much "in law" and too much vinegar and not enough syrup to temper the matrimonial relation. This thing of living happily ever afterward is measured by the ability to readjust and cultivate mutual attitudes and desires and not by the manner in which we persevere in fixed habits of former days. Mutual atttitudes and concessions are not generated by squirting vinegar into the running gear of the marital chassis; it sharpens the tongue instead of the wits, is devoid of post nuptial vitamins that mellow the disposition and render the matrimonial relation a succession of squeaks, squalls, and discords. Even the house fly will pass up vinegar for syrup. The man or woman who fails to learn this before consummating the banns needs education in the commonplace.

Affirmed.

CHAPMAN and THOMAS, J. J., concur.

BROWN, C. J., concurs specially.

Brown, C. J. (concurring).—As this suit for divorce was brought by the husband, and as no allowance of *alimony* is involved, I do not think that Sec. 4987 C. G. L. (3195 of Rev. Gen. Stats.) has any application. See Baker v. Baker, 94 Fla. 1001, 1007; 114 So. 661, 664. This appears to render it unnecessary to consider the effect of the holding in Phinney v. Phinney, 77 Fla. 850, 82 So. 357. I concur in the conclusion reached to the effect that there was ample testimony to sustain the chancellor's decree. And the chancellor's jurisdiction to award the custody of the children to either the mother or the father, or partly to both, as the welfare of the child or children, and the fitness of the parent or parents, may require, is clearly vested by Section 4993 C. G. L., which is derived from an Act adopted in 1828. See McGill v. McGill, 19 Fla. 341.