480 So.2d 1366 (1985)
SHANDS TEACHING HOSPITAL AND CLINICS, INC., Appellant,
v.
Rebecca SMITH, Appellee.
No. BC-307.
District Court of Appeal of Florida, First District.
December 30, 1985.
David A. Roberts, III, Gainesville, for appellant.
Hal Castillo, of Lewis, Paul, Isaac & Castillo, Jacksonville, for appellee.
PER CURIAM.
Shands Teaching Hospital appeals the trial court's dismissal of its complaint against Rebecca Smith for payment of medical bills incurred by her husband, now deceased. Although appellee's husband entered into an agreement with the hospital which bound him as guarantor for all charges which were not paid by his insurance company, appellee never agreed in writing to pay for the services provided to her husband. In its order, the trial court conceded that Manatee Convalescent Center, Inc. v. McDonald, 392 So.2d 1356 (Fla. 2d DCA 1980) and Parkway General Hospital, Inc. v. Stern, 400 So.2d 166 (Fla. 3d DCA 1981), both hold that a wife is responsible for her husband's medical bills, even in the absence of a written contract, but declined to follow that authority because it found that the common law imposes no liability on a wife for the necessaries of her husband; therefore the only way that a wife can be held responsible for the medical bills of her husband is by contract.
The common law doctrine of necessaries, judicially countenanced in this state by our Supreme Court, Phillips v. Sanchez, 35 Fla. 187, 17 So. 363 (1895), has never been explicitly altered by constitution, Court or statutes, to require a wife to be subject to an action by a facility which has provided medical services to her husband without her contractual assumption; see specifically Article I, Section 2, and Article X, Section 5, Chapters 61 and 708 of the Florida Statutes, and Gates v. Foley, 247 So.2d 40 (Fla. 1971) (despite the reliance on such authorities by the courts in Manatee Convalescent Center and Parkway General Hospital). The lesson to be learned from Hoffman v. Jones, 280 So.2d 431, 434 (Fla. 1973), is that in the absence of constitutional or statutory authority reflecting a change in established law, the district courts of appeal do not enjoy the prerogative of overruling controlling precedent of the Florida Supreme Court. We also view the issue here as one which is most appropriate for legislative concern.
We therefore affirm the trial court's order, certifying conflict with Manatee Convalescent Center and Parkway General Hospital.
*1367 ERVIN and WENTWORTH, JJ., concur.
BARFIELD, J., concurs with opinion.
BARFIELD, Judge, concurring:
I concur in the majority's affirmance of the trial court's order and its suggestion that the issue in this case is properly one for the legislature. However, because this case presents so clearly the divergent views on the role of the judiciary, and because the majority cites Hoffman v. Jones, 280 So.2d 431 (Fla. 1973), for a singular lesson, implying the propriety of that decision as a function of the judicial prerogative, I must separately discuss my analysis of this case and the reasons for my decision to affirm the trial court's order.
There are three possible bases for the liability of one person for the debts of another: voluntary agreement of the party to be held liable, statutory enactment, or common law rule. In Florida, the legislature has enacted no statute requiring a wife to be responsible for the medical expenses of her husband. Appellee did not agree to pay for the medical services provided to her husband. At old English common law, because she was not deemed capable of contracting and thus suffered discrimination predicated solely on her sex, a wife could only function in the economic environment with the assurance that her husband was available to pay her bills. The husband was therefore responsible for the necessaries of his wife, including medical expenses. However, at common law the wife was not liable for her husband's necessaries, because a married woman was deemed legally incapable of incurring any obligation independent of her husband.
In Manatee and Parkway the Second and Third District Courts of Appeal were presented with cases factually similar to the one at issue. In ruling that wives are now liable for the medical expenses of their husbands, even when they have not agreed to be held responsible, these courts have reasoned that, with the liberalization of the Florida Constitution and the various Florida statutes dealing with married women, the wife should be treated the same as the husband in reference to the necessaries of the spouse. These courts have attempted to "modify" the common law rule of necessaries "so as to equalize the financial responsibilities of each spouse for the necessaries of the other." Manatee, 392 So.2d at 1358. In Parkway, the court held that the only ways in which the wife can avoid this responsibility are to have dissolved the marriage before her husband's hospitalization, or to have somehow prevented the illness which required it. 400 So.2d at 167.
I have no quarrel with our sister courts' perceptions that a one-sided application of the common law doctrine of necessaries is an anachronism in our modern society. I do, however, have grave reservations concerning the approach taken by these courts, and the conclusions to which this approach has led. While I acknowledge the power of the court to abrogate a common law rule found to be inconsistent with constitutional or statutory law, that power does not include the authority to judicially create new liabilities and causes of action which did not exist at English common law prior to July 4, 1776. In my opinion, our sister courts have erred in answering a question not properly before them, basing their determinations on equal protection challenges raised by creditor-hospitals who did not have standing to raise such challenges and ignoring a potentially viable basis for abrogating the common law doctrine. They have ventured beyond their proper sphere of activity by attempting to extend a common law rule to create new liabilities and a new cause of action, a usurpation of the legislative function. In deciding this case I have attempted to avoid those pitfalls and seek by this opinion to express my views regarding the proper role of a court when presented with such a question.
At the outset, it should be noted that section 2.01, Florida Statutes (1983), originally enacted in 1829, provides that the general common and statute laws of England in existence on July 4, 1776, are of force in this state, except where inconsistent with our constitutions and statutory laws. Prior enactments by the Legislative Council of the Territory in 1822 and 1823, provided, respectively, for adoption of the *1368 common law and general statutory laws of England in effect "prior to" 1607 and "down to" July 4, 1776, unless inconsistent with the Constitution and laws of the United States or the acts of the Legislative Council. See Legislative Notes, Sketch of the Evolution of Florida Law, 3 U.Fla.L. Rev. 74 (1950). "Common law" has been variously defined, depending on the context in which it is used. The term has been used to describe "that portion of the law that derives its force from custom and immemorial usage and not from statutory enactment." Day, Extent to Which the English Common Law and Statutes Are in Effect, 3 U.Fla.L.Rev. 303, 303 (1950). The term is often used to describe that body of law which originated in England and has been adopted, in various forms, in this country and others. Black's Law Dictionary lists several definitions, including "that part of the positive law, juristic theory, and ancient custom of any state or nation which is of general and universal application." Black's Law Dictionary, Fourth Edition, at 346. So, too, in this opinion, the term "common law" is used in several contexts, and must be construed within the confines of the context in which it is used. Courts, when they become involved in construction of the common law, lest they be accused of tinkering or worse, must be precise in their terms, logical in their reasoning, and restrained in their exercise of judicial power.
Under the doctrine of judicial restraint, a court is limited to deciding only questions properly presented to it and necessary to the determination of the case. Although in another factual context, a husband may have standing to challenge the common law doctrine of necessaries as a violation of the equal protection provisions of both the federal and Florida constitutions, appellant does not have standing to raise such a challenge. Were this a case where a husband was being sued for the medical expenses of his wife based on the common law doctrine of necessaries, the husband would arguably have standing to challenge the doctrine as violative of his constitutional right to equal protection. However, such a case is not before us. While the Supreme Court of New Jersey found, under circumstances factually similar to the case at issue, that a creditor-hospital had standing to raise an equal protection challenge to the common law doctrine of necessaries, I find its reasoning illogical and its conclusions incorrect.[1]
Even if the court, properly presented with a valid equal-protection challenge to the common law doctrine of necessaries, were to find the common law rule inconsistent with the constitutional equal protection provisions, there would remain the question of the extent to which the court could properly modify the rule. There are several possible approaches: 1) The court might nullify the rule,[2] declaring it no longer of force in Florida, or 2) the court might extend the rule to create a new liability (on the wife) and a new cause of action (for the husband's creditor) that did not exist at common law.[3] In addition, it would be necessary to determine whether the modification *1369 would be effected prospectively[4] or retroactively.[5] Which course would best serve the needs of Florida's citizens is a policy decision of such fundamental proportions that it is only properly determined by the legislature. Consequently, were we properly presented with such a question, rather than judicially expand the doctrine by creating a new liability on the wife pending legislative consideration and disposition of the matter, I would be inclined to hold that the common law doctrine of necessaries is not part of the common law of Florida, and that neither husband nor wife is liable, absent a contract or statutory enactment, for necessaries, including medical care, supplied to a spouse. I emphasize that we do not so hold in this case, because the question has not been properly presented to us. We base our certification of conflict with Manatee and Parkway in part on the fact that in those cases the courts impliedly found, under circumstances apparently identical to the case at issue, that an equal protection challenge was properly raised.
The trial court correctly found that there was no legal basis for the liability claimed by appellant. We are satisfied that appellee is not obligated by contract, by statute, or by common law rule to pay her husband's creditors for medical services provided to him. We have not been properly presented with the question whether the common law doctrine of necessaries has been abrogated by legislative enactment. However, were that question to be raised by a husband sued for payment of his wife's medical bills, I would be inclined to rule that the Florida Legislature has preempted the field of family support and supplanted the common law notions and doctrines of support with modern concepts of alimony and support. With the total emancipation of women it is no longer the creditor who is the focus of attention. By enactment of Chapter 61, Florida Statutes, the legislature has provided that, during marriage as well as after dissolution, the matter of support between the spouses is to be determined by the courts, on a case-by-case basis, predicated on relative need and ability to pay.[6] The liability of a spouse for a debt without agreement, by operation of law, is not a viable concept in the face of legislation which requires that the existence and extent of any obligation on the part of one spouse to provide the necessaries of the other spouse must be based on a determination of their relative resources, abilities and disabilities.[7] By contrast, it should be noted that the law obligates both parents to provide the necessaries of their minor children, because of the legal incapacity of children.[8] I recognize the implications of this view for the demise of the doctrine of necessaries as it applies to husbands, but that issue is not now before us. We hold in this case only that the common law doctrine of necessaries cannot be made applicable to wives in Florida.
Because we are of the opinion that the decisions in Manatee and Parkway are incorrect, we find no error in the trial court's failure to follow that authority. We affirm its finding that, since appellee did not agree in writing to pay for her husband's medical care, she cannot be held responsible under contract or under the common law. Because I am in complete disagreement with the rationale as well as the holdings in Manatee and Parkway, and because I recognize the far-reaching consequences of the precedent set by them, I am compelled to discuss the fundamental concepts which underlie my vehement opposition to the course espoused by those decisions.
Judicial activism of the nature found in Manatee and Parkway is both elitist and *1370 dangerous. It is result oriented without considering the appropriateness of the means employed. When the judiciary becomes the avant-garde for what it perceives as forthcoming trends in societal conduct without the legislative machinery to test those trends, it not only departs from its constitutional role in government, but also subjects itself to the risk of reactionary political attacks that can so weaken it as to preclude its effective functioning as a safeguard for human rights. In order to avoid such reactionary political influences, the court must maintain consistency and adherence to a methodology based upon separation of powers.
Our founding fathers, suspicious of absolute central authority, conceived a system in which the power of government was divided among three coordinate branches which provided mutual "checks and balances" on the exercise of legislative, executive and judicial power. The Constitution of Florida, Article II, Section 3, divides the sovereign power of this state into these same three branches, specifically prohibiting a person belonging to one branch from exercising any powers "appertaining to either of the other branches unless expressly provided herein."
This doctrine of separation of powers has been called "the fundamental principle of every free and good government" which "gives to our system energy, vitality and stability."[9] One commentator has observed that democracy does not survive unless power is divided, and that, "If it was a delusion to believe that a complete separation of functions could ever exist among the organs of government, it was not a delusion, however, but a uniquely great contribution to provide the checks and balances that exist among the branches of government ..."[10] Another maintains that, "it is our political structure that accounts, in large measure, for our free society,"[11] but also notes, "A system of divided and shared power is, of course, difficult to operate, demanding political skills of the highest order. It requires accommodations that often seem irksome or inefficient."[12] Those who espouse the type of judicial activism seen in Manatee and Parkway seek to avoid the inefficiencies of lawmaking carried out by the officially elected representatives of the people by imposing on the people laws made by judges who are for the most part not responsible to the electorate.[13] While such men may "legislate" wisely and well in some instances, "such a system does not produce or become a democratic structure."[14] As Breitel warns:[15]
Because so many of us like so much of what we have received at the hands of the judges, as if they were so many philosopher-kings, the risk is that we will trade away the force of the ballot... ... . [M]odern self-government only exists through a supreme representative legislative body... . The power of the courts is great indeed, but it is not a power to be confused with evangelic illusions of legislative or political primacy... . [S]elf-restraint by the courts in lawmaking must be their greatest contribution to the democratic society.
The era during which our federal Constitution was drafted was dominated by a *1371 "natural law jurisprudence"[16] which viewed the judicial function as a process of "discovery" whereby the natural order of things was delineated. By the middle of the nineteenth century, natural law concepts began to be replaced by a formalism or positivism which focused on the "interpretation" of the law, as found in textual sources such as constitutions, statutes or precedents.[17] While the positivist approach directly disposed of the easy cases in which statutory or constitutional law was clear and not in conflict, it gave judges little guidance in deciding the hard cases, where one documentary source conflicted with another or where the documentary sources contained no clear answer to the legal question presented.
In reaction to the positivist approach and to the abuse of the courts' constitutional lawmaking power during the early decades of the twentieth century,[18] there developed in this country what one commentator has labeled the "Legal Process Model",[19] a jurisprudential approach that rejects formalism and recognizes judicial creativity, but fearing the risk to the democratic system of a misuse of unbridled judicial power, seeks to restrict that creativity by confining it to issues that are noncontroversial, "apolitical" and not complex. There has also emerged an interrelated but distinct school of thought labeled the "Reform Model",[20] the "cosmic view" of the judicial function,[21] or pragmatic instrumentalism.[22] As explained by one commentator:[23]
To the pragmatic instrumentalist, law, whether statutory or constitutional, is an instrument for the ordering of human conduct to achieve societal ends. Thus, the force of law derives from the society's decisions or consensus about the end in question and both judges and legislators fashion legal rules as means to achieve these objectives... . [D]ecisions can be evaluated as good or bad depending on whether they are pragmatically instrumental in effectuating their articulated objective.
This approach emphasizes the practical necessity of judicial innovation to meet constantly changing conditions and values, urging that the real danger is not excessive judicial creativity, but rather that the common law will not be responsive enough to changing social conditions and values.[24] Some courts have embraced these tenets in replacing traditional tort doctrine with the sweeping reforms of the last twenty years. This has spawned much debate over the proper balance between the judicial and legislative branches in the reform of the law, but, as one commentator has observed,[25] this debate has taken place
chiefly among scholars and only rarely within the courts themselves. The judiciary for the most part has been content to stay its hand with conclusory statements that the legislature is a more appropriate forum for change or to actively instigate change with equally conclusory proclamations of its duty to intervene. The superficiality of many courts' discussions of the issue has led to charges that the statements often function as expedients to justify a decision already reached rather than as analytical methods of reaching a decision.
Recognizing that "to retain its claim to legitimacy the law must respond to changes in human relationships, economic structures, and societal attitudes,"[26] and that "our legal tradition assigns to courts a creative role in improving law, as well as a *1372 guardian's role in preserving its continuity and predictability,"[27] and assuming that the question of the continued viability of a specific common law rule is properly presented, the court would first determine whether the rule should be changed and then, by whom and to what extent it should be changed. As to the first determination, certain considerations militate against any change that is not required by compelling circumstances or that is not carefully planned to avoid future inequities. These are: 1) the need for certainty and predictability; 2) the justice and equality in treating similar cases similarly; 3) fairness to those who have justifiably relied on the extant rule in their transactions; 4) the need for continuity in the law (a change in one rule may significantly affect other rules); and 5) the efficiency of following precedent (which encourages settlement rather than litigation).[28]
The second question, by whom and to what extent the change should be made, is one which requires an examination of the requirements of effective change and the relative abilities of courts and legislatures to satisfy those requirements.[29] Commentators have distilled from the various arguments for and against judicial lawmaking lists of factors to guide courts in deciding whether to reform current law judicially or yield to the legislature.[30] In brief, those *1373 arguments center on considerations of the relative competence of judges and legislators to formulate and enforce social policy, and the probable effects on our judicial and legislative institutions, as well as on our democratic system, of the expanding judicial activism seen in this country over the last several decades.[31]
Certain functional differences between courts and legislatures must be recognized. For profound and historical reasons, courts have been substantially protected from outside pressures, providing an atmosphere in which relatively pure, disinterested legal decisions can be made. By contrast, the legislative process is deliberately exposed to pressures from interested persons and organizations, encouraging responsiveness to the community.[32] The legislative process is a matter of give and take, as the representatives of various interest groups compromise the ideal in order to achieve the attainable.[33] Somewhat isolated from the political process, courts can more easily ignore current waves of political passion and focus on fundamental questions.[34] At the same time, public perception that the judiciary is "above politics" facilitates voluntary acceptance of unpopular judicial decisions.[35] The absolute necessity of judicial legitimacy establishes the outer limits of the permissible exercise of judicial creativity.[36] The public perception of the courts' legitimacy depends on the soundness of judicial decisions. Those that reflect either excessive passivity or unwarranted activism may be viewed as less sound and may detract from the public's confidence in the courts.[37]
The judicial process is a rational one which presupposes that courts' decisions are justified only when explained or explainable in reason.[38] The judicial process must operate within the framework of a highly disciplined system of already existing legal rules.[39] Proper judicial analysis must begin with an examination of statutes, constitutions and precedent. Two checks provided by the system to ensure a reasoned decision are the right to appeal and the "reasoned elaborated opinion" which explicates the rational derivation of rules from other, extant rules and the ground for the derivation in the situation as it exists.[40] As one writer has observed:[41]
The soul of a government of laws is the judicial function, and that function can endure only if adjudication is understood by our people to be an essentially disinterested, considered, and rational element in our society. Even reinforced by a most carefully crafted Constitution, the fabric that binds society is a delicate one, in need of constant attention. Improvident stretching can be as damaging as taunt resistance to all movement. The care of the social fabric, however, is not for the judges alone, although they have a vital role. Their assumption of responsibilities that have been entrusted to others may rend the fabric and rupture the constitutional design.
It has been argued that courts need not always defer to the legislature and that the judicial structure lends itself to effecting socially desirable legal change because of several characteristics: the relative inability of courts to avoid making a decision *1374 once a case is presented, and the fact that courts are better able to focus on a particular problem, their decisions are more expeditious and more conclusive, and they possess effective tools for refining their decisions.[42] On the other hand, the judiciary's sphere of activity is limited to actual cases presented by particular parties and involving specific issues. Its vision therefore tends to be myopic, focusing on the fairness of the decision to the individual litigants, but often failing to consider the broader policy implications for society in general.[43] The judicial process precludes judges from appealing directly to the people to ascertain public attitudes. The procedural rules of evidence, "geared to the search for truth between the parties, not to the search for truth in general,"[44] hinder the courts' ability to gather and assess information. The courts are also handicapped by their relative inability to undertake comprehensive changes in the law, by the fact that the opportunity for reconsideration and revision depends on the initiative of others, and by the relatively narrow choice of remedies available to them.[45] Unlike legislatures, which are expected to compromise competing interests, courts do not function on compromise, but must usually decide in favor of one or the other litigant.[46]
It has been urged that it is particularly appropriate for courts to modify the common law because, it is argued, this law was initially propounded by the courts.[47] But as one commentator observes:[48]
This argument, however, overlooks the probability of changed circumstances. A rule's interrelations with other rules may have developed over time, so that a current change in it may have much wider ramifications in the legal system than did its original adoption. Similar considerations apply when the principle of complexity is regarded. Moreover, the availability of information may be much more crucial now than it was at the time of the rule's initial adoption. The development of sociology and economics has made it possible to obtain information not obtainable in the nineteenth century. Also, the proposed rule may require such information for an evaluation of its merits while alternative rules considered when the existing rule was originally propounded did not. Hence, the fact that an extant rule is a court-made one is not dispositive in a determination of whether its change is a legislative question.

(emphasis added).
A final justification offered for judicial legislation is the inaction of the legislature: "[S]ince no one else has spoken, the judges must speak."[49] However, legislative silence may reflect any of a variety of attitudes, including legislative approval of the status quo. In addition, judicial lawmaking discourages legislative action and erodes the legislative process, inducing voter apathy and relieving pressure on the legislature to initiate social reconstruction.[50] The absence of judicial self-restraint undermines the craftsmanship of the courts[51] and judicial legislation not responsive to the popular will invites anarchy,[52] or worse, a reactionary straight-jacketing of the courts. Our democratic republic and its judicial system will not succumb to outside forces, but they may succumb to an erosion of confidence caused by the disruptive and *1375 unwise arrogation of legislative power by institutions not suited to its exercise.[53]
Imaginative interpretation of constitutions and statutes is well within the prerogative of the judiciary, but when courts ignore the broad powers within their prerogative and attempt to modify common law rules because they are "outmoded" or "anachronistic", they confuse the judicial role with the legislative. To the extent that a common law rule is inconsistent with our constitutions or statutes, it is within the courts' prerogative to declare it not of force in this state. § 2.01, Fla. Stat. (1983). If, however, the only fault courts can find with a rule is that it does not reflect contemporary societal values or that its application is impractical in our modern world, the proper judicial function is to point out to the legislatures the shortcomings of the rule and the need for change. A fear that legislatures may be slow to reform the law does not invest the judiciary with the authority and duty to take over the reins and institute comprehensive changes. The difficulty is not "the degree of wrongness of particular decisions, but the fundamental wrongness of the judges turning their own value choices into law."[54] Confidence that the judiciary can produce better and quicker solutions to political problems is sometimes difficult for judges to resist,[55] but resist they must in order to preserve the independence of our judicial system.
Our legal education seems to foster the notion that the common law is the primary source of our law, followed by the federal and state constitutions and the acts of our legislatures. If we recognize that before the creation of the Constitution and the legislature there was only a common law, we would remember to put the common law in its rightful place. In this country, our constitutions are the primary sources of the law. From them emanate the legislatures and their acts; against them all law is tested. If our courts cannot, by means of imaginative and creative interpretation, find the answers to their questions in the federal and state constitutions and statutory enactments, they may turn to the common laws of England in force on July 4, 1776, as specified in section 2.01, Florida Statutes.[56] They may then reach back, remove *1376 from the shelf, and dust off the "common law" solution in order to preserve the rights of the parties until the legislative branch can deal with the problem. If our courts would look first to the constitutions and the legislative acts that flow from them before turning to the common law and attempting to perpetuate and extend it, the separation of powers envisioned by the drafters of our constitutions would be preserved.
The difficulties which result from a failure to approach the task in this manner are manifest in Gates v. Foley, 247 So.2d 40 (Fla. 1971), in which the Florida Supreme Court adopted a rule allowing a wife to sue a third party who injured her husband for her loss of consortium. At common law, a wife could not maintain an action for loss of consortium due to the injury of her husband.[57] Nineteen years before Gates v. Foley, the Florida Supreme Court had been faced with the question of whether this common law rule was binding in the case of Ripley v. Ewell, 61 So.2d 420 (Fla. 1952). It noted that section 2.01, Florida Statutes, preserves the common law "only in those cases where it is `not inconsistent' with acts of the Legislature,"[58] but held that the statutes changing the common law in regard to the respective rights, duties and responsibilities of husband and wife "are not inconsistent with the maintenance of the distinction between the relative rights of husband and wife to sue for the loss of consortium."[59] The court declined to follow the holding in the Hitaffer[60] case relied upon by the appellant, because it found the arguments advanced in that case,
many of which are founded on sound reasoning and which logically support the conclusion reached if considered as an argument of what the law should be... might well appeal to the Legislature. But we find them wholly unconvincing when viewed from the only angle from which our jurisdiction permits us to consider them, namely, a determination of what the law of Florida is.

61 So.2d at 423 (emphasis added).[61]
*1377 How to explain, then, the later decision in Gates v. Foley receding from this position? The court might have rested its decision on a finding that the common law rule barring the wife's maintenance of such an action was inconsistent with constitutional provisions guaranteeing equal protection and access to courts, so that the common law rule became a nullity or was never adopted as the law in Florida.[62] The court might have rested its decision on a finding that statutes enacted by the Legislature in other related areas indirectly modified the common law rule to permit the wife to sue for loss of consortium.[63] Indeed, the court's opinion suggests that these are possible bases for the decision. However, the opinion also contains language[64] which has been relied upon in subsequent opinions in which the court's authority to reform the law was not so clearly evidenced.[65]
A recent example of this trend is Insurance Company of North America v. Pasakarnis, 451 So.2d 447 (Fla. 1984), in which the Florida Supreme Court held that evidence of failure to wear an available seat *1378 belt could be considered by the jury in assessing a plaintiff's damage under certain circumstances. The Supreme Court noted this court's decision in Brown v. Kendrick, 192 So.2d 49 (Fla. 1st DCA 1966) which held that the issue of the "seat belt defense" was one for the legislature rather than the courts to resolve, but found the issue "particularly appropriate for judicial decision,"[66] quoting some of the unfortunate language from Gates v. Foley.[67] Justice Shaw dissented[68] from the majority opinion, noting that the legislature had specifically prohibited, in any civil action, the admission of evidence that a child passenger restraint was not provided and used, so that even a violation of the parents' statutory duty[69] to use seat belts or other restraints on their small children could not be used to reduce damages.[70] He concluded:[71]
If one accepts the proposition that there is no common law or statutory duty to wear seat belts, and that the wearing of such belts has been rejected by a majority of the public despite the urging of industry and the federal government, then the duty this decision places upon the Florida motorist is at the very least based upon a debatable public policy determination best left to the legislature... . The majority's defense ... smacks of judicial policy making ...
I am reluctant to tread on established legal principles and impose a new duty upon the Florida motoring public, absent legislative action. The majority decision establishing this duty creates a host of technical problems... .
In sum, I disagree with the majority for two reasons. First, in view of the technical difficulties, cost factors, and problematical nature of the public policy which the majority establishes, I am not persuaded that the decision is wise public policy. Second, the question of the enforced use of safety belts has been before the legislature, which has not acted to impose such a requirement. On the contrary, the legislature has established a requirement that restraining devices be used for infants only. § 316.613, Fla. Stat. (1983). Significantly, in my view, our elected representatives have chosen not to require seat belts or restraining devices for children above five years of age or for adults when it could easily have done so. I consider it an unwarranted and inappropriate use of judicial power to impose by fiat a debatable public policy on an unwilling public.

Justice Shaw has recently authored the majority opinion in Zorzos v. Rosen, 467 So.2d 305 (Fla. 1985), in which the court declined to recognize a cause of action for loss of parental consortium where the parent does not die, observing,[72]
[I]f the action is to be created, it is wiser to leave it to the legislative branch with its greater ability to study and circumscribe the cause. In addition, we are influenced by the fact that the legislature has recognized a child's loss of parental consortium in a wrongful death action but has not created a companion action for such loss when the parent is injured but not killed. Although this omission may be only an oversight, it strongly suggests that the legislature had deliberately chosen not to create such cause of action.
Justice Ehrlich dissented,[73] reasoning that the Florida Legislature, by enacting the 1972 wrongful death statute recognizing a cause of action for loss of parental consortium where the parent dies, established public policy and changed the common law, which had denied a minor child any claim for damages against a tortfeasor for injuries *1379 to a parent. He concluded that the Florida Supreme Court as well has the authority to and should establish such a right of action, citing Gates and other cases, because, "It is a principle whose time has long since arrived."[74]
Had there been no legislative action in the area, the court in Zorzos might have appropriately recognized, as it did in Gates, the existence of an injury and removed the common law bar to the remedy as inconsistent with the law of Florida. However, even where it might be within the court's authority so to act, the considerations noted in Clark v. Suncoast Hospital, 338 So.2d 1117 (Fla. 2d DCA 1976), would weigh against judicial formulation of this right of action.[75] As observed by the court in Clark and approved by the court in Zorzos, "[T]here could be merit to [plaintiffs'] position from a policy standpoint. But, if these contentions are to be considered, they should be addressed by the legislative branch after a comprehensive study."[76]
Notwithstanding similar considerations weighing against judicial formulation of a cause of action for creditor-hospitals against wives for medical services provided to their husbands, and absent legislative action, not to mention "comprehensive study," the courts in Manatee and Parkway have plunged ahead with "a principle whose time has long since arrived," at least in the minds of the judges who authored or concurred in those opinions. As authority for their actions, they once more rely upon the language of Gates v. Foley.[77] In Hoffman v. Jones the Florida Supreme Court warned that a district court exceeds its authority when it attempts to establish a new rule of law and overrule precedent set by the higher court. More specifically, the court said, "To allow a District Court of Appeal to overrule controlling precedent of this Court would be to create chaos and uncertainty in the judicial forum, particularly at the trial level." Id. at 434. But are not chaos and uncertainty created when the Florida Supreme Court is inconsistent in its own approach to "outmoded" common law rules?[78] *1380
*1381 Hoffman v. Jones is a landmark of jurisprudence in Florida. A discussion of the proper scope of judicial action cannot avoid confronting this decision of our supreme court. No matter how noble or admirable the motives of the court, Hoffman broke *1382 all the rules of judicial restraint and separation of powers, and it did so in spite of the fact that the legislative and executive branches were struggling with the question of comparative negligence. Within the opinion itself is the evidence of the government's awareness, for eighty-seven years, of the concept of comparative negligence, and the inability of the legislature to command enough votes to establish it as the public policy of Florida by overriding the governor's veto.[79] In divining its solution, apparently without the need for legislative mechanics, the court declined "to dissect and discuss all the possible variations of comparative negligence which have been adopted in other jurisdictions."[80] If the legislature and the governor had not yet been able to resolve the complexity of the issues involved in adopting the rule of comparative negligence, upon what empirical data could the Florida Supreme Court?
There is a "common law tradition" which must remain inviolate and which includes the power of the court to give redress for an injury, as it did in Champion v. Gray, 478 So.2d 17 (Fla. 1985). However, this power may not conflict with a contrary manifestation of legislative intent or one which casts doubt on the appropriateness of the court's action, so well explained by Justice Shaw in Pasakarnis. By contrast, Parkway and Manatee have nothing to do with the redress of an injury, but instead create a windfall to an otherwise uninjured creditor and force a potentially insurmountable obligation on an unsuspecting person. Justice B.K. Roberts, who concurred in Gates v. Foley, warned us in his dissent in Hoffman v. Jones,[81]
[T]he primary question is not whether or not the law... should be changed, but rather, who should do the changing... . If such a fundamental change is to be made in the law, then such modification should be made by the legislature where proposed change will be considered by legislative committees in public hearing where the general public may have an opportunity to be heard and should not be made by judicial fiat. Such an excursion into the field of legislative jurisdiction weakens the concept of separation of powers and our tripartite system of government.
NOTES
[1] In Jersey Shore Medical Center-Fitkin Hospital v. Estate of Baum, 84 N.J. 137, 417 A.2d 1003 (1980), the New Jersey court found that when expenses were sought from the wife, the creditor was the appropriate party to assert the husband's rights, because his estate was not represented in the suit and was, in any event, insolvent. It noted that the only time a husband could raise an equal protection challenge to the doctrine of necessaries would be if he were sued by the hospital to recover the last illness expenses of his wife, but concluded that when a wife is sued by the hospital for her husband's last illness expenses, "the hospital has a sufficient stake in this controversy to accord it standing to challenge the doctrine of necessaries." Id. 417 A.2d at 1007.
[2] Condore v. Prince George's County, 289 Md. 516, 425 A.2d 1011, 1019 (1981).
[3] The Pennsylvania courts have held a wife liable for the cost of necessaries provided to her husband so long as it is shown she is capable of bearing the financial burden, see United States v. O'Neill, 478 F. Supp. 852 (E.D.Pa. 1979) and cases cited therein. The New Jersey court adopted a modified version of the rule, which provides that, absent an agreement, the assets of one spouse are exposed to satisfy a debt incurred by the other spouse only where the latter's assets are insufficient to satisfy the debt. Jersey Shore, 417 A.2d at 1010.
[4] Manatee, 392 So.2d at 1359.
[5] Parkway, 400 So.2d at 167.
[6] § 61.09-.10, Fla. Stat. (1983).
[7] We do not view section 856.04, Florida Statutes (1983) as an indication of legislative intent to retain the common law doctrine of necessaries, in light of Chapter 61. In fact, were the issue properly presented, this statute would probably not survive an equal protection challenge.
[8] §§ 39.41(1)(g), 61.09-.10, 61.13, 742.031, Fla. Stat. (1983).
[9] Ponder v. Graham, 4 Fla. 23, 25 (1851), cited in Justice Robert's dissent in Hoffman v. Jones, 280 So.2d 431, 441 (Fla. 1973).
[10] Breitel, The Lawmakers, 65 Colum.L.Rev. 749, 776 (1965).
[11] Adams, Judicial restraint, the best medicine, 60 Judicature 179, 180 (1976).
[12] Id.
[13] While we recognize that appellate judges in Florida are subject to "retention" elections, we have seen no substantial evidence that this affects either the judges' decisions or the rationale behind those decisions to any great extent.
[14] Breitel, supra note 10, at 771.
[15] Id. at 771, 777; Breitel further warns:

It is folly and a contradiction of the teachings of history to believe, whatever the defects of the legislative institution, that democracy can be preserved without legislative primacy in a people-elected and a people-responsive delegate legislature.
Id. at 763. See also Downs, Judges, law-making and the Constitution: a response to Professor White, 63 Judicature 444, 451 (1980).
[16] Clinton, Judges Must Make Law: A Realistic Appraisal of the Judicial Function in a Democratic Society, 67 Iowa L.Rev. 711, 732 (1982).
[17] Id. at 735.
[18] See Ursin, Judicial Creativity and Tort Law, 49 Geo.Wash.L.Rev. 229, 232 (1981).
[19] Id. at 230.
[20] Id. at 231.
[21] Adams, supra note 11, at 180.
[22] Clinton, supra note 16, at 736.
[23] Id.
[24] Ursin, supra note 18, at 231.
[25] Commentary, Reforming the Common Law: A Factor Analysis for Alabama Courts, 34 Ala.L. Rev. 631, 632 (1983).
[26] Id. at 631.
[27] Keeton, Judicial Law Reform  A Perspective on the Performance of Appellate Courts, 44 Tex. L.Rev. 1254, 1259 (1966).
[28] Bayles, On Legal Reform: Legal Stability and Legislative Questions, 65 Ky.L.J. 631, 637 (1977).
[29] See Commentary, supra note 25, at 635.
[30] Id. at 646-48:

The major arguments concerning the relative strengths and weaknesses of courts and legislatures as lawmakers ... may prove more useful to a court deciding whether to instigate a given legal change if consolidated into a list of factors. The list that follows is not exhaustive, nor are the factors mutually exclusive. Without suggesting the relative weights the factors should carry, however, this list does provide the [judiciary] an analytical construct against which to measure its decisions on implementing legal reform:
(1) The extent to which the court can acquire and assess information concerning societal needs and attitudes relevant to the proposed change, and the extent to which the legislature can do so;
(2) The extent to which the legislature is likely to weigh its information fairly, without ignoring the social needs of less organized segments of society;
(3) The extent to which the court will be able and willing to remedy unintended effects of the new rule as they are manifested, and the extent to which the legislature will be so able and willing;
(4) The frequency with which the court is likely to be afforded the opportunity to refine the new rule in later cases, and the frequency with which the legislature is likely to correct problems resulting from a legislative rule;
(5) The extent to which the change may be accomplished with a clear and simple rule requiring few distinctions and exceptions;
(6) The extent to which the court can elucidate the elements and limits of the rule in the case before it;
(7) The extent of the current rule's relations to other rules not at issue in the present case, the intricacy of these relations, and the extent to which these relations may be unpredictably disrupted by a new rule;
(8) The comprehensiveness of the change; the extent to which a large set of social relations must be altered, created, or destroyed;
(9) The extent to which segments of the public have relied on the current status of the law, and the extent to which they would be harmed by imposition of a new rule;
(10) The extent to which failure to reform the law will adversely affect the long-term stability of the law;
(11) Whether the existing rule is a judicial creation;
(12) Whether the remedies available to the court are adequate to construct and implement the rule;
(13) The extent to which judicial action may discourage more complete legislative action;
(14) The absence of legislative efforts to deal with the social need, and the likelihood that legislative inaction will continue.
(cites omitted). See also, Bayles, supra note 28, at 647:
The combination of the functional differences between courts and legislatures, when taken in conjunction with the considerations underlying the principle of stability, provides certain principles constitutive of the standard of legislative questions. These principles concern: (1) The interrelation of the extant rule with other rules; (2) the complexity of the proposed rule; (3) the scope of the proposed rule; (4) the availability of information relevant to the relative desirability of the extant and proposed rules; and (5) the need for a bright line in a gray area. Another consideration, alternative means of change, is relevant to differences in judicial activity in reform of constitutional, statutory, and common law. The ultimate basis of each of these principles is a functional limit on courts.
[31] See Commentary, supra note 25, at 635-46; see also Adams, supra note 11, at 180-83; Bayles, supra note 28, at 645-47; Breitel, supra note 10, at 759-77; Downs, supra note 15, at 451-53.
[32] Breitel, supra note 10, at 761.
[33] Downs, supra note 15, at 453.
[34] Id. at 452.
[35] Id.
[36] Commentary, supra note 25, at 635.
[37] Id.
[38] Breitel, supra note 10, at 772.
[39] Id.
[40] Id. at 774.
[41] Adams, supra note 11, at 183.
[42] See Commentary, supra note 25, at 635-37.
[43] Id. at 639.
[44] D. Horowitz, The Courts and Social Policy 48 (1977).
[45] See Commentary, supra note 25, at 640-41.
[46] Id. at 641; see also Bayles, supra note 28, at 647.
[47] See Friedmann, Legal Philosophy and Judicial Lawmaking, 61 Colum.L.Rev. 821, 838 (1961).
[48] Bayles, supra note 28, at 653-54.
[49] Hopkins, Public Policy and the Formation of a Rule of Law, 37 Brooklyn L.Rev. 323, 330 (1971).
[50] See Adams, supra note 11, at 181; Commentary, supra note 25, at 641.
[51] Breitel, supra note 10, at 776.
[52] Downs, supra note 15, at 453.
[53] See Adams, supra note 11, at 182.
[54] Downs, supra note 15, at 451.
[55] See Adams, supra note 11, at 180.
[56] As noted earlier in the text, the common law and general statutory law in England in effect "prior to" the fourth year of the reign of James I of England (i.e., 1606) was adopted in 1822 by the Legislative Council of the newly created Territory of Florida. The 1822 Act continued in force until June of 1823, when the Council provided that, with certain minor exceptions included in the enactment, the common and statute law of England of a general nature "down to" July 4, 1776, would be in effect in the Territory, unless inconsistent with the Constitution and laws of the United States or the acts of the Legislative Council. Legislative Notes, Sketch of the Evolution of Florida Law, 3 U.Fla.L.Rev. 74 (1950). In 1829, this enactment was repealed and then substantially reenacted, and remains in effect today. § 2.01, Fla. Stat. (1983). There is an obvious divergence of opinion regarding the role of English law within the American system. I view section 2.01, Florida Statutes, as a codification of certain English laws in existence on July 4, 1776, to the extent necessary to "fill in the gaps" not addressed by our constitutions and legislative acts. If that perception is erroneous, why then did not the Legislative Council in 1823 adopt the common law of England in existence in 1823?

In 1838, the Territorial Convention framed a constitution which became effective upon admission of Florida into the Union in 1845. Prior to statehood, the organic law of the Territory was, of course, the Constitution of the United States. Id. at 75. No rational legal scholar would contend that specific provisions of the Florida Constitution do not control over inherited English common law, yet section 2.01 does not provide for exclusion of common law inconsistent with the Florida Constitution. I consider this further indication that the legislation was originally intended and continues to be a "stopgap" measure to which the courts need resort less and less as the legislature has developed, over the intervening 140 years, an increasingly comprehensive body of laws. Once the legislature realizes that the judiciary is able to use section 2.01 to "out-legislate" the legislature, it may amend section 2.01 to make it abundantly clear that we in Florida do not operate under the English common law, subject only to specific legislative changes of that law.
Unlike the English system, ours is a constitutional form of government. The only reasonable construction of our jurisprudence is that it must be constitutionally and legislatively based, and not divined by judges operating under the old English common law system. This distinction between the American and English systems is emphasized by the comment of an English jurist who viewed with satisfaction his nearly omnipotent power to make law, "unencumbered by that thing called the Constitution." This phrase, borrowed second-hand, eloquently supports my view.
[57] Allstate Insurance Co. v. Collier, 428 So.2d 379 (Fla. 4th DCA 1983).
[58] Ripley v. Ewell, 61 So.2d 420, 421 (Fla. 1952).
[59] Id. at 423.
[60] Hitaffer v. Argonne Co., 183 F.2d 811 (D.C. Cir.1950).
[61] The Ripley court also observed:

However, the principal reason that prevents us following the Hitaffer case is that, as we understand the language used, the Court in that case admitted that the law as pronounced in all common-law jurisdictions does not recognize a cause of action by a wife to recover for a loss of her husband's consortium but that Court considered the reasons given for this rule of law to be "specious and fallacious", consequently that Court refused to follow the common law. We do not feel that we are that independent of the legislative branch of Government.
The common law has been adopted by legislative act. It has been modified to some extent by legislative acts. If further changes are desirable in the public interest, the changes should come from legislation. This case illustrates the wisdom of such a rule and strict adherence to it. In the first place if a change in this common law is to be made it is a legislative rather than a judicial function to decide whether it is more desirable in the public interest to take away the husband's cause of action for loss of consortium which has existed since the beginning of our jurisprudence or to recognize a similar right in the wife which has never before been considered to exist. In the second place we would be blinding ourselves to known conditions if we did not appreciate the fact that almost daily accidents occur which come within the scope of the questions here presented and that in most cases the parties responsible make settlements with those injured.
If we were to adopt the rule asserted by appellant, all such cases, when the husband was the injured party, and within the statute of limitations, would be reopened and a new claim presented by the wife, and new liabilities imposed upon persons who have already paid once for the result of their negligent acts. While we should not hesitate to declare the law as we find it, even though the unwary who have been ill advised in their action may suffer, we should not by judicial fiat make changes in established law that will injuriously affect many persons who could not possibly foresee or anticipate such action on our part.
61 So.2d at 424 (emphasis added).
[62] In Waller v. First Savings & Trust Co., 103 Fla. 1025, 138 So. 780 (1931), the court held that the common law rule which made an action for personal injuries in tort die with the tort-feasor never became part of the common law of Florida, because it was inconsistent with the state constitutional provision of access to courts. The court noted that under the common law of England, tort actions were for vengeance and not for compensation, but under the American theory of constitutional protections, actions for recovery of damages for torts "are no longer to be regarded as mere punitive retaliations against the tort-feasor, but as a means of recompense to the citizen wronged." Id. at 1037, 138 So. at 785 (emphasis in the original). The court observed:

To affirm such a judgment as has been rendered in this case is to ignore the plain provision of our constitutional Declaration of Rights that the courts shall always be open so that a person injured in his person or property shall have a "remedy" against his wrongdoer.
Id. (emphasis in the original). See also State v. Herndon, 158 Fla. 115, 27 So.2d 833 (1946), in which the court held that the common law rule vesting the ownership of the wife's property in the husband "has been abrogated in Florida by the Constitution and the [Woman's Emancipation] statute." Id. at 116, 27 So.2d at 834. The court noted that this abrogation was by implication, but that "repeal by implication is no less effective than direct repeal." Id.
[63] In Banfield v. Addington, 104 Fla. 661, 140 So. 893 (1932), the court held that the common law rule that a married woman was incapable of making a contract had been modified by a statute giving a married woman the right to engage in employment separate from her husband. The court found that the statute "has conferred upon her the right to engage servants in connection with any such employment, and has imposed upon her liability for any negligent acts of such servants committed on behalf of such married woman, for which such married woman herself would be liable had she personally committed them." Id. at 676, 140 So. at 899. The court noted the well settled rule in Florida "[t]hat the common law may be modified indirectly as well as directly, by a statute which is `inconsistent' with the common law in a particular instance." Id. at 675, 140 So. at 899. See also State v. Herndon, note 62, and Randolph v. Randolph, 146 Fla. 491, 1 So.2d 480 (1941), in which the court held that the common law rule giving the father a superior right to guardianship over minor children was abrogated by statutes making both parents joint guardians of the children and providing for their custody and support in the event of the parents' divorce.
[64] 247 So.2d at 43-44:

It may be argued that any change in this rule should come from the Legislature. No recitation of authority is needed to indicate that this Court has not been backward in overturning unsound precedent in the area of tort law. Legislative action could, of course, be taken, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule....
The recent changes in the legal and societal status of women in our society forces us to recognize a change in the doctrine with which this opinion is concerned... .
So it is that the unity concept of marriage has in a large part given way to the partner concept whereby a married woman stands as an equal to her husband in the eyes of the law. By giving the wife a separate equal existence, the law created a new interest in the wife which should not be left unprotected by the courts.
[65] See Insurance Company of North America v. Pasakarnis, 451 So.2d 447, 451 (Fla. 1984); Hoffman v. Jones, 280 So.2d 431, 436 (Fla. 1973); Rosen v. Zorzos, 449 So.2d 359, 361 (Fla. 5th DCA 1984), quashed, 467 So.2d 305 (Fla. 1985); Manatee Convalescent Center, Inc. v. McDonald, 392 So.2d 1356, 1357 (Fla. 2d DCA 1980), cited with approval in Parkway General Hospital, Inc. v. Stern, 400 So.2d 166, 167 (Fla. 3d DCA 1981).
[66] 451 So.2d at 451.
[67] Id.
[68] 451 So.2d at 455. Justice Adkins concurred in the dissent.
[69] § 316.613, Fla. Stat. (1983).
[70] 451 So.2d at 455.
[71] Id. at 456-57 (emphasis added).
[72] 467 So.2d at 307.
[73] Id. Justice Adkins concurred in the dissent.
[74] Id. at 308.
[75] 338 So.2d at 1118-19.
[76] Id. at 1119.
[77] See note 65.
[78] In Co-Operative Sanitary Baking Co. v. Shields, 71 Fla. 110, 70 So. 934 (1916), the court declined to modify the well-settled common law rule of contributory negligence, stating:

The only modification of this common-law principle which the Legislature of this state has seen fit to make is in regard to injuries occasioned by railroad companies... . If this common-law principle is to be still further modified, it must be done by the Legislature, as it is beyond the power and province of the courts.
Id. at 116, 70 So. at 936 (cites omitted). However, in Hoffman v. Jones, 280 So.2d 431 (Fla. 1973), the court apparently reconsidered its authority to replace the rule of contributory negligence with that of comparative negligence, noting that prior to 1809 "there was no clear-cut, common law rule that contributory negligence was a complete defense to an action based on negligence." Id. at 434. The court observed that even if it could be said that contributory negligence was a part of our common law by virtue of prior judicial decision, "this Court may change the rule where great social upheaval dictates." Id. at 435. (See further discussion of Hoffman in the text.)
When presented with the question of whether a municipal corporation could be sued for the torts of its law enforcement officers, the court held in Kennedy v. City of Daytona Beach, 132 Fla. 675, 182 So. 228 (1938) that the common law theory of sovereign immunity had not been abrogated by statute, and that
the matter of changing the law is not one to be indulged by the court but is a legislative function....
The legislature has the power to by valid enactment change the law in this regard and to provide that in cases like this municipalities may be held liable for the torts of its [sic] police officers, and other officers and agents committed when exercising sovereign power. The wisdom or lack of wisdom of such law would be a matter for legislative determination, but until such time as the legislature by valid enactment shall have changed the law in this regard this court is in duty bound to adhere to the law of the land as now established and recognized.
Id. at 678, 182 So. at 229. See also City of Miami v. Bethel, 65 So.2d 34, 35 (Fla. 1953), including specially concurring and dissenting opinions, and Williams v. City of Green Cove Springs, 65 So.2d 56 (Fla. 1957), including dissenting opinions. Then in Hargrove v. Town of Cocoa Beach, 96 So.2d 130 (Fla. 1957), the court apparently reversed directions, implicitly declaring the rule inconsistent with constitutional access to courts provisions and finding that "the time has arrived to face this matter squarely in the interest of justice and place the responsibility for wrongs where it should be." Id. at 133. The court seems to have characterized the rule of sovereign immunity as one which was announced by the court in prior cases and receded from those decisions "in order to establish a rule which we are convinced will be productive of results more nearly consonant with the demands of justice." Id. at 134.
The language of other cases, cited in chronological order below, demonstrates the various postures taken by the court when presented with "hard cases."
Waller v. First Savings & Trust Co., 103 Fla. at 1032, 138 So. at 783:
We agree with the argument that as a general proposition courts are not warranted in founding their decisions upon their individual ideas of natural justice, when to do so runs counter to established prior decisions interpreting the law as applied to a like state of facts previously considered, and we may concede the point also that the function of the court in the present case must be to now interpret and apply the law as it exists, leaving it to the Legislature to make such statutory changes or amendments as new conditions or a more enlightened understanding of right and justice may require.
(emphasis in the original) (the court went on to hold that the common-law rule was inconsistent with the Constitution and therefore never became part of the common law of Florida, see note 62);
Banfield v. Addington, 104 Fla. at 673, 140 So. at 898:
But the foregoing view of the legal relationship of husband and wife is no longer warranted, when by modern conditions and through modern statutory provisions the wife has been emancipated with respect to her personal wages and earnings. Where the reason for a rule of the common law, which is the spirit and soul of that law, fails, the rule itself fails... . It is only logical and just therefore that the courts take cognizance of those new conditions, which, by their necessary implication, have modified the factors necessary to support pre-existing restrictions on the legal liabilities of married women which existed under the common law as construed in the early cases on the subject... ... . Present day statutes and twentieth century conditions have necessarily modified the ancient rules in this respect.
(cites omitted) (the court held that the common law rule had been indirectly modified by statute);
Layne v. Tribune Co., 108 Fla. 177, 185, 146 So. 234, 237 (1933):
Courts of justice are bound by the rule of stare decisis to follow the common law as it has been judically declared in previously adjudicated cases. And the courts as such have no inherent right to revise or amend the settled rules of the common law to suit their own ideas of wherein the law should be modernized by amendments which would overturn long standing precedents. But it does not follow from what has been said in this regard, that the courts are wholly powerless to remold and reapply the ancient rules so as to fit them to modern conditions, where there has arisen and become involved, new factors of life and business arising from the complexities of a mechanized era of human progress. And indeed it is the duty of the courts to do so in cases appropriately calling for a modern application of ancient precepts to new facts of human experience in an advancing civilization.
(the court held that there was no presumption of malice in the republication of a false news dispatch);
Randolph v. Randolph, see note 63 (although the court held that the common law rule was abrogated by statute, language in the opinion suggests that the rule was discarded because it was obsolete);
Merchant's Hostess Service of Florida v. Cain, 151 Fla. 253, 258, 9 So.2d 373, 375 (1942):
So if there was ever sound reason for the disability of coverture, that reason has disappeared, every element on which it was predicated has been outmoded and discarded. In the marital state, husband and wife are partners and equals; in business both know their way about and being so there is no earthly reason why the wife should be hobbled by such an impediment. There is every reason to discard it when its main use is to void her obligations.
In many contracts such as deeds and mortgages, the disabilities of coverture have been imposed by statute and, in many states, they have been removed in the same manner. It is not in the province of a court to tinker with these, but in equity the situation is different... . [S]ince every factor on which the disability of coverture was predicated has disappeared, ... in equity it should be removed in all cases where a married woman goes out and contracts for business or commercial purposes. The reason ceasing, the law itself ceases is a well settled legal maxim.
State v. Herndon, 158 Fla. at 117, 27 So.2d at 835:1
We do not consider this holding in any sense amenable to the charge of judicial lawmaking. It is quite true that under our scheme of things courts are not clothed with the power to enact laws in the first instance but they do have the power and it is their duty to keep legislative and constitutional enactments ambulatory, likewise it is their duty within the scope of their power to square the law with good morals and to harmonize constitutional and statutory precepts with reason and good conscience, otherwise they may become ridiculous when applied to changing concepts. Interpreting the law in the light of changing concepts is very different from promulgating the law in the first place.
(the court held the common law rule was impliedly abrogated by the Constitution and by statute, see note 62);
Ripley v. Ewell, 61 So.2d at 423:
When the rules of the common law are in doubt, or when a factual situation is presented which is not within the established precedents, we are sometimes called upon to determine what general principles are to be applied, and in doing this we, of necessity, exercise a broad judicial discretion. It is only proper that in such cases we take into account the changes in our social and economic customs and present day conceptions of right and justice. When the common law is clear we have no power to change it.
(the court held the common law rule was clear and was not implicitly abrogated by statutes, see notes 57-61 and accompanying text);
Duval v. Thomas, 114 So.2d 791, 794-95 (Fla. 1959), (after quoting the above-cited language of Ripley v. Ewell):
It does not seem to us that we are obligated in a case of this kind to embrace the view that by clear provisions of the common law the owners should be restricted to operations within their own land lines. On the contrary, we feel free to announce that the body of water should be available to all owners for use that would not unreasonably interfere with rights of the other proprietors... .
We think the situation of Thomas is a classic example of the unpleasant and impractical state of affairs that would result from the application of a rule that each owner could erect a barricade on his boundary line, though it was of the kind, such as a fence, that would not disturb the waters in place, but would prevent adjacent owners from enjoying the ordinary pleasures of the lake.
Having concluded that we are not bound to the common law rule as it is defined by the petitioners, we exercise the discretion recognized in Ripley v. Ewell, supra, and adopt the civil rule... .
We are not advised, and our own research has not divulged the clear, unambiguous pronouncement of the common law in effect 4 July 1776, that would leave us no room but to adopt it in this case under the mandate of Sec. 2.01, supra... .
We lean to the more liberal rule and we think we may be kept from falling, into error, by the obscureness of the common law rule, the resultant power to use our own discretion, the practicalities of the matter and the expressions in our own opinions.
Gates v. Foley, see note 64; State v. Egan, 287 So.2d 1, 6-8 (Fla. 1973):
Surely, no legislative adoption is necessary to affirm the existence of the common law. Just as surely, however, it is urged that a statutory enactment is essential to repeal, abrogate, or change the rules or doctrine of the common law. It requires no citation of authority to support the rule that the common law is not to be changed by doubtful implication. Of course, where the implication is obvious, it cannot be ignored. But no statute is to be construed as altering the common law farther than its words and circumstances import. While, admittedly, a court can and should strike down any common law crime that fails to pass constitutional muster, it is emphasized that it is the province of the legislature and not of the court to modify the rules of the common law. The court has no more right to abrogate the common law than it has to repeal the statutory law. In other words, courts may properly extend old principles to new conditions, determine new or novel questions by analogy, and even develop and announce new principles made necessary by changes wrought by time and circumstance. Under our constitutional system of government however, courts cannot legislate. They cannot abrogate, modify, repeal, or amend rules long established and recognized as parts of the law of the land.
....
... Whenever a principle of the common law has been once clearly established, the courts of this country must enforce it until repealed by the legislature, as long as there is a subject matter for the principle to operate on, and although the reason, in the opinion of the court, which induced its original establishment may have ceased to exist. Of course, when the rules of the common law are in doubt, or when a factual situation is presented which is not within the established precedents, courts are called upon to determine what general principles are to be applied, and, in so doing, of necessity, must exercise a broad judicial descretion. The courts of this jurisdiction do, and properly so, take into account the changes in our social and economic customs and present day conceptions of right and justice. But the fact remains as this Court said in Ripley v. Ewell, "When the common law is clear we have no power to change it."
....
... Suffice it to say that the common law has been adopted by legislative act. It has been modified to some extent by subsequent legislation. Surely, if further changes are desirable in the public interest, those changes should come from the legislature.
(the court upheld the validity of a statute adopting the common law of England with respect to crimes);
Insurance Company of North America v. Pasakarnis, see notes 66-71 and accompanying text; Zorzos v. Rosen, see notes 72-74 and accompanying text.
[79] 280 So.2d at 437-38.
[80] Id. at 438 (emphasis added).
[81] Id. at 443.