830 So.2d 856 (2002)
Ion V. SANCHO, Individually and as Leon County Supervisor of Elections, et al., Appellants,
v.
Jim SMITH, in his official capacity as Florida Secretary of State and head of the Florida Department of State; and Robert A. Butterworth, as Florida Attorney General, Appellees.
No. 1D02-3293.
District Court of Appeal of Florida, First District.
September 18, 2002.
*858 Stephen H. Grimes and Susan L. Kelsey of Holland & Knight LLP, Tallahassee, for Appellants.
Robert A. Butterworth, Attorney General and Jonathan A. Glogau, Special Counsel, Tallahassee, for Appellees.
Dudley Goodlette, Naples, Thomas R. Tedcastle, Donald J. Rubottom, and David M. Delapaz for the Florida House of Representatives as Amicus Curiae.
PADOVANO, J.
In this appeal we must decide whether the ballot summary for a proposed constitutional amendment satisfies the fair notice requirements of the Florida Constitution. The proposal at issue would modify the prohibition against cruel or unusual punishment in article I, section 17 of the Florida Constitution. It will be identified as "Amendment 1" on the ballots prepared in all Florida counties for the 2002 general election. For the reasons that follow, we conclude that the ballot summary for Amendment 1 accurately describes the substance of the proposed amendment. Therefore, we affirm the trial court's order allowing the placement of the amendment on the ballot.
The appellants are fifteen supervisors of elections from various parts of the state.[1] They initiated their challenge to Amendment 1 by filing a complaint for declaratory and injunctive relief in Leon County, naming the Secretary of State and Attorney General as defendants. In essence, the complaint alleges that the ballot summary is inaccurate and misleading, and that it contains unnecessary information. The supervisors sought a declaration that the ballot summary for Amendment 1 fails to meet minimum constitutional standards and an order enjoining the placement of the Amendment on the ballot.
If the proposal at issue is approved by the voters, it will amend article 1, section 17 of the Florida Constitution as follows:
SECTION 17. Excessive punishments.Excessive fines, cruel and or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden. The death penalty is an authorized punishment for capital crimes designated by the Legislature. The prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution. Any method of execution shall be allowed, unless prohibited by the United States Constitution. Methods of execution may be designated by the Legislature, and a change in any method of execution may be applied retroactively. A sentence of death shall not be reduced on the basis that a method of execution is invalid. In any case in which an execution method is declared invalid, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method. This section shall apply retroactively. *859 This proposal is identical to one that was adopted by an earlier joint resolution of the Florida Legislature and approved by the voters in the 1998 general election. At that time, however, the amendment was described by a different ballot summary.
The Florida Supreme Court declared the 1998 ballot summary invalid in Armstrong v. Harris, 773 So.2d 7 (Fla.2000), on the ground that it failed to give the voters fair notice of the effect of the revision. The ballot summary provided to the voters in 1998 was as follows:

No. 2

CONSTITUTIONAL AMENDMENT ARTICLE 1, SECTION 17 (Legislative)
BALLOT TITLE: PRESERVATION OF THE DEATH PENALTY; UNITED STATES SUPREME COURT INTERPRETATION OF CRUEL AND UNUSUAL PUNISHMENT
BALLOT SUMMARY: Proposing an amendment to Section 17 of Article I of the State Constitution preserving the death penalty, and permitting any execution method unless prohibited by the Federal Constitution. Requires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment. Prohibits reduction of a death sentence based on invalidity of execution method, and provides for continued force of sentence. Provides for retroactive applicability.
The court held in Armstrong that this ballot summary failed to give fair notice to the voters of the effect of the proposed amendment, because it incorrectly implied that the change in the constitution would apply only to the death penalty. In fact, the change would apply to any kind of punishment that is alleged to be excessive.
The court in Armstrong also determined that the language in the ballot summary requiring "construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment" was misleading. This language, the court concluded, suggests that the amendment promotes a constitutional right by forcing the Florida courts to adhere to decisions of the United States Supreme Court, when, in fact, it reduces an existing right in the Florida Constitution.
As the challenge to the 1998 ballot summary was working its way through the court system, the Legislature amended section 101.161(1), the statute governing ballot summaries for proposed constitutional amendments. This statute was amended in 2000 as follows:
...Except for amendments and ballot language proposed by joint resolution, the substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.
Ch. 00-361, § 1, Laws of Fla. The phrase "joint resolution" refers to a proposed amendment submitted by a joint resolution of the Legislature under article XI, section 1 of the Florida Constitution. The effect of this change in the statute is to exempt the Florida Legislature from the 75-word limit applicable to a ballot summary for an amendment by citizen initiative or by another authorized method of amending the constitution.
Following the 2000 revision of section 101.161(1), Florida Statutes, and the Armstrong decision, the Legislature passed a joint resolution adopting the proposed Amendment to article 1, section 17, this time with a more detailed ballot summary. The text of the ballot summary is as follows:

*860 BALLOT TITLE: AMENDING ARTICLE I, SECTION 17 OF THE STATE CONSTITUTION
BALLOT SUMMARY: Proposing an amendment to the State Constitution identical to a proposed amendment to Section 17 of Article I of the State Constitution which was approved by a statewide vote in 1998. The Supreme Court of Florida struck the 1998 amendment in a ruling in which four of the seven justices found that the ballot summary was inaccurate. The proposed amendment expressly authorizes the death penalty for capital crimes and expressly authorizes retroactive changes in the method of execution. The amendment changes the prohibition against "cruel or unusual punishment," currently provided in Section 17 of Article I of the State Constitution, to a prohibition against "cruel and unusual punishment" to conform with the wording of the Eighth Amendment to the United States Constitution. The amendment prohibits reduction of a death sentence based on invalidity of an execution method and provides for continued force of the sentence. The amendment permits any execution method unless prohibited by the United States Constitution. The amendment requires construction of the prohibition against cruel or unusual punishment and the proposed prohibition against cruel and unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment to the United States Constitution. The amendment would prevent state courts, including the Florida Supreme Court, from treating the state constitutional prohibition against cruel or unusual punishment as being more expansive than the federal constitutional prohibition against cruel and unusual punishment or United States Supreme Court interpretations thereof. The amendment effectively nullifies rights currently allowed under the state prohibition against cruel or unusual punishment which may afford greater protections for those subject to punishment for crimes than will be provided by the amendment. Under the amendment, the protections afforded those subject to punishment for crimes under the "cruel or unusual punishment" clause, as that clause currently appears in Section 17 of Article I of the State Constitution, will be the same as the minimum protections provided under the "cruel and unusual" punishments clause of the Eighth Amendment to the United States Constitution. The amendment provides for retroactive applicability.
The ballot summary then sets forth the full text of the proposed amendment with an explanation that words deleted from the previous version are shown by strikethrough marks and that added words are shown by underlining. The 2002 ballot summary quoted above is the ballot summary in controversy here.
In the course of the proceeding in the trial court, the supervisors filed a motion for a temporary injunction. In this motion, they sought an order enjoining the placement of Amendment 1 on the ballot. They restated their objections to the ballot summary, and alleged that the controversy would become moot if not resolved before the general election. The trial court held a hearing on the motion on August 12, 2002, and the parties presented arguments for and against the injunction.
On August 16, 2002, the trial court entered an order denying the supervisors' motion. The court concluded that the ballot summary adequately described the proposed amendment and that the Legislature had a constitutional basis for excluding amendments proposed by joint resolution from the word limits that apply to other kinds of proposed amendments.
*861 The supervisors appealed to this court and we granted their motion to certify the trial court's order to the Florida Supreme Court under the pass through provision in article V, section 3(b)(5) of the Florida Constitution. See Fla.R.App.P. 9.125. However, the supreme court declined to exercise discretionary jurisdiction to review the order under the pass through provision. The appeal is now back before this court for a decision on the merits.
We begin with the standard of review. Although an order denying a motion for temporary injunction is ordinarily subject to review by the abuse of discretion standard, the issue the trial court resolved in denying the motion in this case was an issue of law. The parties did not present evidence on any material point, and the trial court did not have discretion to determine whether the proposed amendment should remain on the ballot. Because the decision of the trial court was a decision on a point of law, the order denying the injunction in this case is subject to review on appeal by the de novo standard. See Armstrong, 773 So.2d at 11.
The legal standard we must follow in determining whether the ballot summary gives fair notice is well established in Florida. A court may not order the removal of a proposed constitutional amendment from the ballot unless the record shows that the proposal is "clearly and conclusively defective." Askew v. Firestone, 421 So.2d 151, 154 (Fla.1982); Armstrong, 773 So.2d at 11. The arguments in opposition to Amendment 1 do not meet this high standard.
The parties agree that a ballot summary for a proposed amendment to the state constitution must accurately describe the amendment. This requirement is implied in article XI, section 5, which describes the method of submitting a proposed amendment for a vote. The supreme court explained in Armstrong that "the proposed amendment [must] be accurately represented on the ballot; otherwise, voter approval would be a nullity." 773 So.2d at 12 (emphasis in original). The court relied on precedents to the same effect. For example, in Firestone, the court noted that a ballot summary must give "fair notice" of the decision the voter is to make. 421 So.2d at 155. See also Smathers v. Smith, 338 So.2d 825, 829 (Fla.1976). The court in Armstrong characterized the accuracy requirement as a "truth in packaging" law for the ballot. 773 So.2d at 13.
It is now settled that the accuracy requirement applies to amendments proposed by any authorized method, including those that are proposed by joint resolution of the Florida Legislature under article XI, section 1. See Askew, 421 So.2d at 154-155. On this point, the court in Armstrong made the following remarks:
The accuracy requirement in article XI, section 5, imposes a strict minimum standard for ballot clarity. This requirement plays no favoritesit applies across-the-board to all constitutional amendments, including those proposed by the Legislature. The purpose of this requirement is above reproachit is to ensure that each voter will cast a ballot based on the full truth. To function effectivelyand to remain viablea constitutional democracy must require no less.
773 So.2d at 21 (emphasis in original). It is clear to us from these statements that the accuracy requirement for ballot summaries is rooted in the Florida Constitution itself and does not depend on legislation.
By these principles, we conclude that the ballot summary for Amendment 1 accurately describes the amendment. The 2002 ballot summary corrects all of the *862 deficiencies identified by the supreme court in the Armstrong opinion. Moreover, the 2002 ballot summary includes a copy of the full text of the amendment itself, and it includes underlining and strikethrough marks showing exactly how article 1, section 17 will be changed if the amendment is approved.
One of the problems identified in Armstrong was that the statement in the 1998 ballot summary that the amendment would require Florida courts to conform to United States Supreme Court decisions interpreting the Eighth Amendment, incorrectly suggested that the amendment would promote constitutional rights, when, in fact, it would restrict existing rights. The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." (emphasis added). Hence, a punishment alleged to be excessive could only run afoul of the federal constitution if it is both cruel and unusual. In contrast, article 1, section 17 prohibits "cruel or unusual punishment." (emphasis added). A punishment alleged to be excessive would violate the Florida Constitution if it is either cruel or unusual. It follows that the constitutional right created by article 1, section 17 of the Florida Constitution is greater than the constitutional right created by the Eighth Amendment. The court pointed out in Armstrong that the ballot summary failed to inform voters that the existing provision in the state constitution forbids cruel or unusual punishment, and that the effect of the proposed amendment would be to reduce the rights of Floridians to the minimum rights afforded by the Eighth Amendment.
The 2002 ballot summary removes any uncertainty about this point. Voters will now be told that the amendment "would prevent state courts, including the Florida Supreme Court, from treating the state constitutional prohibition against cruel or unusual punishment as being more expansive than the federal constitutional prohibition against cruel and unusual punishment or United States Supreme Court interpretations thereof." This sentence plainly describes the effect of the proposed amendment, but if there could be any doubt, it would be completely removed by the next sentence, which states, "The amendment effectively nullifies rights currently allowed under the state prohibition against cruel or unusual punishment which may afford greater protections for those subject to punishment for crimes than will be provided by the amendment." Whether this is a good idea is not for us to say, but it is clear to us that no voter will be confused about what is at stake.
Another problem identified in Armstrong was that the 1998 ballot summary suggested that the proposed change in the prohibition against cruel or unusual punishment would apply only to the death penalty, when in truth it could be applied to all criminal punishment. The 1998 ballot summary contained a statement in the title and in the text that the proposal was an amendment "preserving the death penalty." The court in Armstrong reasoned that this statement was misleading because the effect of the amendment would "nullify a long-standing constitutional provision that applies to all criminal punishments, not just the death penalty." Armstrong, 773 So.2d at 18.
This problem has also been cured by the language used in the 2002 ballot summary. The proposed amendment is no longer introduced as a measure to preserve the death penalty, and it is clear that the proposed change would apply to any punishment alleged to be excessive. It is true that the death penalty is mentioned a number of times in both the ballot summary and the text of the amendment. However, these references are connected to specific *863 proposals that apply only to capital punishment, and not to the broader change effected by the amendment.
For example, the 2002 ballot summary states that the proposed amendment "expressly authorizes the death penalty for capital crimes and expressly authorizes retroactive changes in the method of execution." It also states that the amendment "prohibits reduction of a death sentence based on invalidity of an execution method and provides for continued force of the sentence" and that it "permits any execution method unless prohibited by the United States Constitution." These references to the death penalty pertain to separate parts of the proposal.
The ballot summary does not suggest that the proposed change in the existing prohibition against cruel or unusual punishment will apply only to the death penalty. In fact, it plainly states that Amendment 1 would "nullify rights allowed under the state prohibition against cruel or unusual punishment which may afford greater protections for those subject to punishment for crimes." (emphasis added). This statement makes it clear that the proposed change could be applied to any form of criminal punishment.
The supervisors also contend that the ballot summary for Amendment 1 is not truly a "summary" of the amendment, because it is too long. However, the Florida Constitution does not impose a brevity requirement for ballot summaries. Section 101.161(1) provides that a ballot summary shall not be more than 75 words, but this provision no longer applies to amendments submitted by a joint resolution of the legislature under article XI, section 1.
An unnecessary statement that is false or misleading might render a ballot summary invalid. For example, in Evans v. Firestone, 457 So.2d 1351 (Fla.1984), the court concluded that a ballot summary was invalid, in part because it contained a superfluous editorial comment. That was the context in which the court stated that a "ballot summary should tell the voter the legal effect of the amendment, and no more." Id. at 1355. (emphasis added). The supervisors seize upon this quotation to support their argument that the ballot summary in this case is invalid, but the situation here is different. Nothing in the language of the ballot summary for Amendment 1 is untrue or misleading. Perhaps the summary could have been more concise, but that is not the test of its constitutional validity.
Section 101.161(1) does effectively impose a brevity requirement by limiting the ballot summary for a proposed constitutional amendment to 75 words. As we have explained, however, the 2000 revision of the statute excludes ballot summaries for amendments submitted by joint resolution of the Legislature. The supervisors contend that this statute violates the equal protection clause in article 1, section 2 of the Florida Constitution. They argue that the Legislature had no right to "strengthen its own ability to amend the constitution while comparatively weakening the power of citizens to amend the constitution." An amendment proposed in the citizen initiate process is still subject to the word limit.
We decline to address the merits of this argument, because we conclude that the supervisors lack standing to assert an equal protection challenge to the statute. Whether the 75-word limit imposes an unconstitutional burden on those who would submit a proposed amendment by citizen initiative is not at issue here. Although the supervisors have an interest in assuring that elections run smoothly, they have no real interest in the exemption that is the subject of their equal protection challenge.[2] *864 The statute plainly does not discriminate against them.
Constitutional rights are personal. A party who is not adversely affected by a statute generally has no standing to argue that the statute is invalid. See Sieniarecki v. State, 756 So.2d 68 (Fla. 2000); Sandstrom v. Leader, 370 So.2d 3 (Fla.1979). We acknowledge that courts have made an exception to this rule if the party asserting the claim is protecting the rights of non-parties who are unable to challenge the statute on their own. See State v. North Florida Women's Health and Counseling Servs., Inc., 26 Fla. L. Weekly D419, ___ So.2d ___, 2001 WL 111037 (Fla. 1st DCA 2001), review granted, 799 So.2d 218 (Fla.2001). However, the exception does not apply here. Citizens who are adversely affected by the exemption in section 101.161(1), Florida Statutes (2000) can make the argument for themselves.
Our conclusion that the supervisors lack standing to challenge the statute is further illustrated by the absence of an effective remedy. If the 75-word limit imposes a First Amendment restriction on those who would submit citizen initiatives, as the supervisors contend, the remedy would be to declare the limit unconstitutional, not to declare that the Legislature must also abide by the same invalid restriction. Yet all we could do in this context if we agreed with the supervisors on the merits of their equal protection claim would be to rewrite the statute to make the 75-word limit applicable to everyone. That we are not at liberty to do.
The supervisors argue that the ballot summary for Amendment 1 will cause a number of practical problems on election day. They have informed us that the ballot summary will require a two-page ballot in counties that use paper ballots, and that it will require multiple computer screens in those counties that use touch screen voting. The supervisors have also expressed their concern that an extremely long ballot summary like the one at issue here will cause inordinate delays in voting. Although we are sympathetic to all of these concerns, our review is narrowly focused on the legal and constitutional issues presented.
We agree that the ballot summary for Amendment 1 is much longer than the typical ballot summary for a proposed constitutional amendment. However, there are special circumstances that required the Legislature to prepare a longer summary in this case and it is doubtful that these circumstances will be repeated often. First, it would be a rare situation in which a ballot summary is successfully challenged after the measure has been approved in an election. In most cases, these issues are sorted out before the election. Apparently, the Legislature wanted to explain to voters why they were voting on this measure again. We cannot say that was unreasonable or unnecessary. Moreover, the proposed amendment would make a number of related but distinct changes in the existing constitutional provision. The amendment would change the wording of the prohibition against cruel or *865 unusual punishment, restrict judicial interpretation of the state constitution, permit various methods of execution, prohibit the reduction of a death sentence based on the invalidity of an execution method, and provide for retroactive applicability. It would be difficult to describe all of these concepts in a brief statement.
Our decision in this case appears to fall within the class of decisions that would ordinarily be certified to the supreme court under article V, section 3(b)(4). We believe that the issue is one of great public importance. However, the supreme court has declined to accept our earlier certification of great public importance under the pass through provisions of article V, section 3(b)(5). The question is no more important now than it was before. Therefore, we decline to certify this decision on our own initiative. If a party requests certification under rule 9.330, we will consider that request.
For these reasons, we conclude that the ballot summary for Amendment 1 gives fair notice of the purpose and effect of the amendment. It is not necessary to consider any of the other arguments raised in briefs, because our decision on this point is controlling. The ballot summary does not violate section 101.161(1), Florida Statutes (2000) or any of the applicable provisions of the Florida Constitution. Accordingly, we affirm the trial court's decision allowing the placement of Amendment 1 on the ballot for the 2002 general election.
Affirmed.
ALLEN, C.J., and WOLF, J., CONCUR.
NOTES
[1] Appellants are Ion V. Sancho, the Supervisor of Elections for Leon County, Florida; and the Supervisors of Elections of fourteen other counties: Alachua, Bay, Escambia, Holmes, Lee, Marion, Okaloosa, Polk, Putnam, St. Lucie, Santa Rosa, Wakulla, Walton, and Washington.
[2] In an analogous situation, the supreme court held that a hospital lacked standing to assert an equal protection challenge to a statute that made a man liable for medical bills incurred by his wife, but did not also make a woman liable for medical bills incurred by her husband. See Shands Teaching Hosp. and Clinics, Inc. v. Smith, 497 So.2d 644 n. 1 (Fla.1986). The hospital had a general interest in collecting its debts, but no real interest in the argument that the statute unfairly discriminates against men. The point is explained in greater detail in an earlier opinion in the same case. See Shands Teaching Hosp. and Clinics, Inc. v. Smith, 480 So.2d 1366 (Fla. 1st DCA 1985) (Barfield, J., concurring).